USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/29/16_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

JORGE GOMEZ,
    a/k/a "Jorge Ulloa,"
    a/k/a "George Gomez,"
SANDY GOMEZ, and
CAROLINA RAMON-BAEZ,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Cr. 348 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendants Jorge Gomez, Sandy Gomez, and Carolina Ramon-Baez are charged with conspiracy to distribute and possess with intent to distribute crack cocaine and heroin in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(A), and 846. (Dkt. No. 1) Sandy Gomez has moved to suppress all physical evidence recovered at the time of his December 7, 2014 arrest, as well as all statements obtained as a result of his allegedly unlawful arrest. (S. Gomez Notice of Motion (Dkt. No. 32) ¶¶ 1-2; see also S. Gomez Decl. (Dkt. No. 33) ¶ 1) Sandy Gomez has also moved for disclosure of Rule 404(b) evidence, as well as Brady and Giglio material. (Id. ¶¶ 3-4) Finally, Sandy Gomez has moved for an order permitting him to make further motions as he deems necessary and join in any motions made by co-defendants. (Id. ¶¶ 5-6) Jorge Gomez has moved to join in Sandy Gomez's motions. (J. Gomez Ltr. Motion (Dkt. No. 36))

## BACKGROUND

### I.     SANDY GOMEZ'S DECLARATION

Sandy Gomez has submitted a declaration alleging the following:  On the evening of December 7, 2014, he was driving a white GMC Yukon on Interstate 59 in Louisiana.  (S. Gomez Decl. (Dkt. No. 33) ¶ 2)  Co-defendant Carolina Ramon-Baez was seated in the front passenger seat.  (Id.)  Although Gomez committed "no traffic violation at any[ ]time," he was pulled over by Louisiana state police.  (Id.)  After the stop, he "was ordered to exit [the] vehicle and asked for [his] driver's license."  (Id.)  Gomez "immediately complied with both requests." (Id.)  Gomez was questioned about his travel plans (id. ¶ 3), and then both officers "enter[ed] the Yukon and searched the entire vehicle without [Gomez's] consent or . . . a search warrant."  (Id.)

One of the police officers then requested a check of Gomez's driver's license, and "[a]pproximately five to six minutes later, [Gomez] overhead on the radio that [the] license was valid."  (Id. ¶ 4)  After returning Gomez's license, "[one of the officers] immediately began questioning [Gomez] about any past arrests, what the arrest was for, how much jail time [he] received, if [he] had any weapons in the car, if [he] had anything illegal, any large amounts of money, any cocaine, any marijuana, any kind of methamphetamine and if anything was inside the truck that [he] should not have."  (Id.)  The questioning officer "blocked [Gomez's] path," and another officer stood to the side with his hand on his gun holster.  (Id.)  Gomez says that he "did not believe [that he] could simply leave without having to push either one of them out of the way or asking them to move."  (Id.)

The officer questioning Gomez then "said [that] he was going to search the vehicle real quick to make sure there was nothing there," to which Gomez "responded 'no.'" (Id.)  The police then provided Gomez with a form, which Gomez says he "was unable to read

because it was dark." (Id.)  Gomez wrote an "S" where the officer indicated, however.  (Id.)

The officer then searched the Yukon again.  (Id.)

    After completing this second search, and "some thirty minutes after . . .

complet[ing] the check of [Gomez's] driver license," an officer "asked [Gomez] if it was okay to

get his dog that was right up the road to come by and do a quick search." (Id. ¶ 5)  Gomez "did

not consent," but the officer "went and got the dog anyway." (Id.)  The officer then conducted a

canine search of the vehicle. (Id.)  Another officer removed luggage from the trunk of the

Yukon and searched the luggage. (Id. ¶ 6)  "The inside of the vehicle was searched again several

times." (Id.)  During these searches, Gomez's cell phone – which was inside the vehicle – rang.

One of the officers "picked up [Gomez's cell phone] and put it inside of his pocket." (Id. ¶ 6)

    "After standing on the shoulder of the highway for more than forty minutes,

[Gomez] was placed in handcuffs and told [that] police believed there was a compartment inside

the vehicle . . . [with] narcotics." (Id. ¶ 7)  An officer "questioned [Gomez] about the secret

compartment," and "then read [Gomez] Miranda warnings." (Id.)  Gomez says that the officer

"did not ask . . . if [he] understood the warnings." (Id.)  Gomez states that although he

"responded to the officer's questions, [he] did not do so knowingly, intelligently and

voluntarily." (Id.)

## II. <u>JORGE GOMEZ'S AFFIDAVIT</u>

    Jorge Gomez has submitted an affidavit asserting the following:

 . . . In early December of 2014[,] I met with a person in New Jersey, who I later
learned was a confidential informant [CI] working with the DEA, for the purpose
of taking possession of a vehicle.

 . . . I paid that person for the use of the vehicle, and I took custody and control of
it.  As such[,] I had a possessory interest in it and an expectation of privacy.

. . . Within days after the vehicle was delivered to me by the CI, it was stopped in Louisiana while being operated by my brother.

(J. Gomez Aff. (Dkt. No. 57) ¶¶ 3-5)

## III.   EVIDENCE AT SUPPRESSION HEARING

On May 11, 2016, the Court conducted an evidentiary hearing concerning the Defendants' suppression motion.  (Suppression Hearing Tr. (Dkt. No. 51) ("Hearing Tr."))  The Government called DEA agent Joseph Dill and Louisiana state trooper Ronald Whittaker, Jr. (Id. at 7, 38)[1]  Jorge and Sandy Gomez did not testify at the hearing.

### A.   Agent Dill's Testimony

Agent Dill's investigation of Defendant Jorge Gomez began in November or December of 2014, after Dill learned from telephone records that a phone used by Jorge Gomez "was in contact with a suspected narcotic trafficker."  (Id. at 8-9)  Agent Dill also "received information from a confidential source that Jorge Gomez . . . was trying to obtain a car with a hidden compartment, also referred to as a trap, for the purpose of using it to pick up a shipment of narcotics."  (Id. at 9)  In early December 2014, the DEA arranged for a cooperating witness (the "CW") to contact Jorge Gomez and to offer to provide a vehicle with a trap.  (Id. at 10-11)  Gomez told the CW that he was interested in renting the vehicle, and agreed to meet with the CW.  (Id. at 11)

On December 3, 2014, the CW met with Jorge Gomez in a Paterson, New Jersey parking lot.  (Id. at 12)  At that meeting, the CW showed Jorge Gomez a GMC Yukon that contained a hidden compartment in the back seat.[2]  (Id. at 12; see also GX 18-T)  This vehicle

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Filing system.

[2]  Defendant Carolina Ramon-Baez – Jorge Gomez's girlfriend – was also present at this meeting.  (Id. at 15)

4

was owned by the DEA. (Id.) During this meeting, Jorge Gomez agreed to rent the Yukon for a three day period, at a cost of $1,500. (Id. at 13) The CW instructed Gomez on how to open the trap, and the two discussed the fact that the trap "could hold about 25 to 30 kilograms of narcotics." (Id.) Jorge Gomez told the CW that "the shipment they were going to get was around 25 kilos." (Id. at 13-14) Jorge Gomez then paid $1,500 to the CW. (Id. at 15)

On December 4, 2014, the CW – acting at Agent Dill's direction – called Sandy and Jorge Gomez to determine whether "they were going to use the vehicle for the trip to pick up . . . drugs." (Id. at 16) During this conversation, Sandy Gomez expressed concern about the hidden compartment in the Yukon, stating that "he didn't like the way it looked." (Id. at 17; GX 15-T at 2-3) The CW told Sandy Gomez that the "car has been driven a lot and it's never had a problem." (GX 15-T at 3) Shortly after this conversation, the DEA learned – as a result of a GPS transmitter installed on the Yukon – that the vehicle had left New Jersey. (Hearing Tr. (Dkt. No. 51) at 19) The Yukon proceeded to Virginia, and then continued on to New Orleans. (Id. at 19-20) At some point along the vehicle's route, the GPS transmitter failed, but agents physically surveilled the vehicle and identified its occupants as Sandy Gomez and Carolina Ramon-Baez. (Id. at 20-21)

Agent Dill informed agents in New Orleans that the Yukon "was a DEA car that was given to Jorge Gomez, and then later Sandy Gomez, with the purpose of picking up a shipment of narcotics," and requested "assistance with watching the car, and then when we feel that the car had picked up the drugs, to conduct a stop of the car." (Id. at 20) Agent Dill informed the New Orleans agents that the Yukon "had [a] trap in the back seat" that "could hold 25 to 30 kilograms" of narcotics. (Id.)

After arriving in New Orleans, agents observed that the Yukon "made numerous stops" over the course of "about . . . a day and a half" and then "started heading north out of New Orleans." (Id. at 21-22)  At that point, Agent Dill "instructed [Drug Task Force Officer Michael Patti] that [agents] should conduct a motor vehicle stop on the car."  (Id. at 21)

**B.     Trooper Whittaker's Testimony**

"A couple of days before" the traffic stop at issue, agents "asked for the assistance of the [Louisiana state police] criminal patrols unit" in "making a stop of a vehicle . . . involved in an active case out of New Jersey." (Id. at 42-43)  In addition to informing Louisiana state trooper Ronald Whittaker of the make, model, color, and license plate number of the vehicle, Whittaker was told that (1) the Yukon being driven by Sandy Gomez was owned by the DEA; (2) the vehicle was equipped with a secret compartment or "trap"; and (3) the targets of the investigation had obtained the Yukon from the DEA for the purpose of using it to transport cocaine from New Orleans to New Jersey; and (4) the cocaine would be hidden in the trap of the vehicle.  (Id. at 43)  Trooper Whittaker was further instructed to perform "[a] walled-off traffic stop," which is "generally a request by another agency to stop a person or a vehicle, but to develop your own probable cause in doing so."[3]  (Id. at 40, 43)

At about 10:00 p.m. on December 7, 2014, the Yukon passed Trooper Whittaker, who was parked in a marked patrol car on Interstate 59.  (Id. at 41, 43)  "When the vehicle passed [Trooper Whittaker], it crossed over the center dashed line of the roadway with its left tires and proceeded north on I-59."  (Id. at 44)  A video camera mounted on Trooper Whittaker's dashboard captured what transpired.  (Id. at 49)  The video shows Trooper Whittaker driving in

---

[3]  According to Trooper Whittaker, "walled-off" traffic stops are designed to ensure that the individuals stopped by a trooper do not become aware "that they're under an active investigation."  (Id. at 40, 43)

the passing lane of the highway and gaining ground on a white sport utility vehicle – the Yukon – in the travel lane.[4] (GX 2 at 0:00-0:25)  Trooper Whittaker observed the Yukon's "right tires hit the fog line," which "is the solid white line on the right side of the roadway that separates the travel lane from the shoulder." (Hearing Tr. (Dkt. No. 51) at 44)

Thirty seconds into the video, the reflection of flashing lights appears as Trooper Whittaker initiates the traffic stop. (GX 2 at 0:30-0:35)  Trooper Whittaker "instructed the driver to exit his vehicle and walk to the front of [the] patrol car."[5] (Hearing Tr. (Dkt. No. 51) at 47) Sandy Gomez stepped out of the Yukon and met Trooper Whittaker in the space between the rear of the Yukon and the front of the patrol car. (GX 2 at 2:04-2:12)  Trooper Whittaker observed that the driver – Sandy Gomez – "walked back to [him] faster than most people do." (Hearing Tr. (Dkt. No. 51) at 48)  On the video, Trooper Whittaker can be heard asking for Gomez's driver license and telling Gomez that he stopped him to make sure that he was "alright to drive," after seeing the vehicle hit the "fog line." (GX 2 at 2:14-2:24)  Without prompting, Gomez states that he is coming from "watching the game"; when Trooper Whittaker asks which team won and by what score, Gomez says that he "lost track." (Id. at 2:25-2:58)

Gesturing to the vehicle's New Jersey license plate, Trooper Whittaker asks Gomez whether he "came all the way from Jersey today?" (GX 2 at 3:04-3:14)  Gomez answers "No," and explains that he and the passenger have come from North Carolina. (Id. at 3:14-3:23; Hearing Tr. (Dkt. No. 51) at 50)  Trooper Whittaker then directs Gomez to stand to the right side

---

[4]  Trooper Whittaker testified that the dashboard camera automatically retrieves the thirty seconds of video proceeding the activation of the patrol car's flashing lights. (Hearing Tr. (Dkt. No. 51) at 81)

[5]  Trooper Whittaker explained that, as a matter of practice, Louisiana state troopers "don't approach vehicles" after making a traffic stop. (Id. at 47)

of the patrol car, and the trooper then approaches the driver's side of the Yukon. (GX 2 at 3:27-3:36)

Trooper Whittaker spoke with the passenger – Carolina Ramon-Baez – through the open driver's side window and asked for the vehicle's registration. (Hearing Tr. (Dkt. No. 51) at 51) When asked "where they were coming from and how long they were there," Ramon-Baez "said [that] they were coming from Alabama."[6] (Id.) While Trooper Whittaker spoke with Ramon-Baez, Trooper Gus McKay arrived and took a position between the Yukon and Trooper Whittaker's patrol vehicle near Sandy Gomez. (Id. at 48; see also GX 2 at 4:12-4:40) According to Trooper Whittaker, Trooper McKay "just basically stood there." Sandy Gomez was not in handcuffs or restrained in any way at that time. (Id. 48, 53)

Trooper Whittaker then walked back to his patrol car to "check for criminal history on [Gomez] and Ramon-Baez." (Id. at 53; see also GX 2 at 4:44-4:52) After determining that Gomez and Ramon-Baez had no criminal history, Trooper Whittaker returned Gomez's driver license and asked whether he had "ever been arrested for anything before." (GX 2 at 12:00-12:30) Gomez responded that he had been arrested for a drug offense. (GX 2 at 12:30-12:52; see also Hearing Tr. (Dkt. No. 51) at 53) Whittaker told Gomez that "what's kind of got me concerned is that the lady who's with you said ya'll were coming from Alabama." (GX 2 at 12:59-13:06) According to Trooper Whittaker, Gomez responded that "maybe she got Alabama and North Carolina confused." (Hearing Tr. (Dkt. No. 51) at 53)

---

[6]  Trooper Whittaker could not recall whether Ramon-Baez responded to him in Spanish or English, and their conversation is not audible on the dashboard camera recording. Although the trooper does not speak much Spanish, he testified that he is able to ask simple questions such as "where they're going, where they're coming from, how long have [they] been there, where do [they] work." (Hearing Tr. (Dkt. No. 51) at 51) Ramon-Baez did not "give . . . any indication that she did not understand [Trooper Whittaker]." (Id. at 52)

Trooper Whittaker then asked whether Gomez had "any weapons in the car," "anything illegal at all," "any large amounts of money," "any cocaine," "any marijuana," or "any kinds of methamphetamines." (GX 2 at 13:22-13:45) Gomez answered no to each question, and stated that "if anything were in the car, [he] would know about it." (Id.) Trooper Whittaker then asked Gomez, "Do you have any problems with me searching real quick and making sure there's nothing in there?" (Id. at 13:45-13:49) Gomez replied, "No." (Id.; see also Hearing Tr. (Dkt. No. 51) at 54)

Trooper Whittaker then presented a Louisiana State Police Consent to Search form to Gomez. (GX 2 at 13:49-14:10; see also Hearing Tr. (Dkt. No. 51) at 55) Trooper Whittaker "went over the form with [Gomez]," and told Gomez "that he had the right to refuse . . . consent if he chose to do so, and even if he gave . . . consent, at any time during the search, he had the right to revoke that consent." (Hearing Tr. (Dkt. No. 51) at 55-56) The form reads as follows:

> I[,] Sandy Gomez[,] . . . do hereby voluntarily authorize S/T Ron Whittaker Jr. of the Louisiana Office of State Police to search [the Yukon] and its contents, which are owned or controlled by me and remove any items the Louisiana Office of State Police deems pertinent to their investigation, providing a receipt is furnished for the removed items. No promise, threat, or coercion of any kind has been made against me by the Louisiana Office of State Police and I have been informed by the above named officer that I may refuse to consent to any search and that I may revoke my consent to search at any time.

(GX 3) Gomez signed the form. (Id.; see also Hearing Tr. (Dkt. No. 51) at 55)

After returning the signed form to his vehicle, Trooper Whittaker searched the Yukon. He noticed "an abnormality in the construction of the second-row seat" – the molding "was a different color and a different texture" than other molding in the vehicle. (Hearing Tr. (Dkt. No. 51) at 61, 63; see also GX 9) After observing this abnormality, Trooper Whittaker

decided to have a canine brought to the scene.[7] (Hearing Tr. (Dkt. No. 51) at 65) The trooper

told Gomez that a canine search would be conducted. (Id.) Gomez did not object or withdraw

consent to the search. (Id.) The dog alerted while being walked around the vehicle. (Id. at 67)

Trooper Whittaker then informed Gomez that the troopers had "located the trap in

the vehicle, that . . . [a police dog had] alerted to the vehicle, and . . . that he was being detained."

(Id. at 69) Trooper Whittaker handcuffed Sandy Gomez and, after administering Miranda

warnings, asked him "if he was aware of the trap or what was in it." (Id. at 69) Gomez

responded that "he didn't know what was in it and that he borrowed the vehicle." (Id.) The

troopers then opened the trap and found "[f]ive kilo[-]sized packages that were suspected to be

cocaine." (Id. at 71; see also GX 14) When told about the packages, Gomez said that he "didn't

know anything about them." (Hearing Tr. (Dkt. No. 51) at 72)

## DISCUSSION

I.    **MOTION TO SUPPRESS**

Jorge and Sandy Gomez have moved to suppress all physical evidence recovered

during the December 7, 2014 traffic stop – including Sandy Gomez's cell phone, three tablets

and his suitcase – as well as all statements obtained as a result of Sandy Gomez's allegedly

unlawful arrest. (S. Gomez Notice of Motion (Dkt. No. 32) ¶¶ 1-2; J. Gomez Ltr. Motion (Dkt.

No. 36); see also S. Gomez Decl. (Dkt. No. 33) ¶ 1)

Sandy Gomez argues that the troopers "lacked [r]easonable [s]uspicion or

[p]robable [c]ause to [s]top and [a]rrest [him] on December 7, 2014." (S. Gomez Post-Hearing

Br. (Dkt. No. 59) at 13) He further contends that "his consent [to search the Yukon] was

---

[7] DEA agent Michael Patti arrived at the scene at about the same time as the canine unit.
(Hearing Tr. (Dkt. No. 51) at 66)

involuntary." (Id. at 20)  Gomez also argues that any "statements made . . . to law enforcement during his seizure on Interstate 59[] should be suppressed since the statements were involuntarily made in response to a custodial interrogation . . . in violation of Miranda." (Id. at 22)

The Government argues that Jorge and Sandy Gomez lack standing to object to the search of the Yukon.  (Govt. Post-Hearing Br. (Dkt. No. 61) at 2)  The Government further contends that – even assuming arguendo that the Defendants have standing – (1) there was reasonable suspicion and probable cause for the traffic stop; (2) Sandy Gomez consented to a search of the vehicle; and (3) "Sandy Gomez knowingly and voluntarily waived his Miranda rights." (Id.)

### A.    Standing

At a May 16, 2016 conference conducted after the suppression hearing, the Court expressed "concerns about whether Jorge and Sandy Gomez have standing to object to the search of the vehicle in question." (May 16, 2016 Conf. Tr. (Dkt. No. 53) at 2)  The Court "reopen[ed] the evidentiary record of the hearing . . . to give the parties an opportunity to supplement the record with whatever they deem[ed] appropriate." (May 16, 2016 Conf. Tr. (Dkt. No. 53) at 2)

Sandy and Jorge Gomez subsequently submitted an affidavit, a declaration, and briefing addressing the standing issue.  (See S. Gomez Supp. Decl. (Dkt. No. 56); S. Gomez Standing Br. (Dkt. No. 55); J. Gomez Aff. (Dkt. No. 57); June 17, 2016 J. Gomez Ltr. (Dkt. No. 58))

1.   **Applicable Law**

The Fourth Amendment standing inquiry focuses on "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."[8]  Rakas v. Illinois, 439 U.S. 128, 140 (1978).

A defendant challenging a search bears the burden of establishing that "he had a legally cognizable privacy interest in the searched premises at the time of the search." United States v. Ruggiero, 824 F. Supp. 379, 392-93 (S.D.N.Y. 1993), aff'd sub nom. United States v. Aulicino, 44 F.3d 1102 (2d Cir. 1995).  This can be accomplished "by showing (a) that he had an expectation of privacy that society is prepared to recognize as reasonable, and (b) that he had conducted himself and dealt with the property in a way that indicated a subjective expectation of privacy." United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993).

The Second Circuit has held that a vehicle owner who lends his vehicle to a third-party does not retain a reasonable expectation of privacy in the vehicle. See United States v. One 1986 Mercedes Benz, 846 F.2d 2, 4 (2d Cir. 1988) ("We believe that by lending the Mercedes to Chow, Parker abandoned any legitimate expectation of privacy in the area searched and thus may not now contest the legality of the search." (citing United States v. One 1977 Mercedes Benz, 708 F.2d 444, 449-50 (9th Cir. 1983)); see also Knecht v. United States, No. 95 Civ. 7796, 1996 WL 54318, at *2 (S.D.N.Y. Feb. 9, 1996) (finding vehicle's owner "had no expectation of

---

[8]  Given that the Yukon is owned by the DEA, the Court invited the parties to address whether either Jorge or Sandy Gomez could properly object to the DEA's search of its own vehicle. (May 16, 2016 Conf. Tr. (Dkt. No. 53) at 4)  Neither side provided any case law concerning this issue, however.  Accordingly, for purposes of ruling on Defendants' motion to suppress, the Court assumes that the DEA's ownership of the Yukon does not – standing alone – preclude Sandy or Jorge Gomez from objecting to the search of the vehicle.

privacy" in "her car while it was being used by someone else" (citing 1986 Mercedes Benz, 846 F.2d at 4)), aff'd, 112 F.3d 504 (2d Cir. 1996).

### 2.   Jorge Gomez's Standing

Jorge Gomez has submitted an affidavit in which he asserts that he "paid . . . for the use of the [Yukon], and [that he] took custody and control of it." (J. Gomez Aff. (Dkt. No. 57) ¶ 4)  He goes on to state that the Yukon he rented "was stopped in Louisiana while being operated by [his] brother."  (Id. ¶ 5)  Jorge Gomez's affidavit does not address the circumstances of his brother taking possession of the vehicle.

Sandy Gomez's supplemental affidavit states that his "brother Jorge Gomez asked [him] to drive [the Yukon] and deliver it to Charlie in Louisiana." (S. Gomez Supp. Decl. (Dkt. No. 56) ¶ 2)

The Court concludes that Jorge Gomez has not demonstrated that he had a reasonable expectation of privacy in the Yukon.  The record shows that after Jorge Gomez rented the Yukon from the CW for a three-day period, he provided the Yukon to his brother Sandy. Having provided the Yukon to Sandy for purposes of making the trip to New Orleans, Jorge Gomez thereby relinquished any expectation of privacy in the vehicle.  See One 1986 Mercedes Benz, 846 F.2d at 4 (a vehicle owner who lends the vehicle to another "abandon[s] any legitimate expectation of privacy in the area searched").  Accordingly, Jorge Gomez lacks standing to object to the search of the Yukon, and his motion to suppress will be denied.

### 3.   Sandy Gomez's Standing to Challenge
the Search of the Yukon's Trap

"Whatever the status of the person asserting a Fourth Amendment claim regarding a search of a vehicle, it is clear that in this circuit, the issue is whether the claimant 'had a reasonable expectation of privacy in the area of the vehicle searched.'"  United States v. Pena,

961 F.2d 333, 337 (2d Cir. 1992) (quoting United States v. Paulino, 850 F.2d 93, 97 (2d Cir.

1988) and citing United States v. Chuang, 897 F.2d 646, 649 (2d Cir. 1980) ("we focus on

whether defendant has established a legitimate expectation of privacy in the area searched");

United States v. Smith, 621 F.2d 483, 486 (2d Cir.1980) ("the threshold question ... is whether

the defendant had a legitimate expectation of privacy in the area searched or in the articles

seized")). "This focus is faithful to the Supreme Court's ruling in Rakas that the determinative

issue is 'whether [the defendant] had a legitimate expectation of privacy in the particular areas of

the automobile searched.'" Id. (quoting Rakas, 439 U.S. at 148).

   Here, Sandy Gomez has submitted a declaration stating that his brother Jorge

asked him to deliver the Yukon "to Charlie in Louisiana." (S. Gomez Supp. Decl. (Dkt. No. 56)

¶ 2)  Sandy Gomez has repeatedly stated that he did not know that the Yukon contained a secret

compartment, and had no knowledge of what was stored in the secret compartment. (See S.

Gomez Decl. (Dkt. No. 33) ¶ 7 ("I knew nothing of a secret compartment because it was not my

truck. . . ."); S. Gomez Supp. Decl. (Dkt. No. 56) ¶ 6 ("I was unaware . . . that the vehicle was

owned by the DEA with a secret compartment."); Hearing Tr. (Dkt. No. 51) at 69, 71-72) (at

time of search, denying knowledge of contents of trap))

   Where – as here – a defendant denies any knowledge of the existence of a trap or

secret compartment, at least one court has found that the defendant lacks a legitimate expectation

of privacy in the items found in the trap. See United States v. Pena Ontiveros, 547 F. Supp. 2d

323, 330 (S.D.N.Y. 2008) ("[N]either defendant has claimed ownership of the items found in the

trap, nor made any showing that they knew of the existence of the trap or its contents.

Consequently, defendants have not demonstrated a legitimate expectation of privacy in the items

found in the . . . trap."), aff'd sub nom. United States v. Rico Beltran, 409 F. App'x 441 (2d Cir.

2011); see also United States v. Fernandez-Jimenez, No. 03 Cr. 1493 (RPP), 2004 WL 1598653, at *5 (S.D.N.Y. July 16, 2004) (finding that defendant who "claimed the bags [in vehicle's trunk] were not his . . . [,] has no claims for an illegal search of the bags" (citing United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) ("Welbeck repeatedly and expressly disclaimed any possessory interest in the Gap bag. . . . Welbeck cannot be heard to complain that the officers violated his privacy interests in a bag he denied was his.")))

Where evidence is recovered from a secret compartment in a vehicle that is in a defendant's custody and control, Pena indicates that the defendant bears the burden of demonstrating that it would be reasonable to anticipate that an "ordinary" person engaged in the activity in question – here, delivering the Yukon to Louisiana – would be authorized to access the vehicle's secret compartment. Pena, 961 F.2d at 338.

In Pena, the defendant submitted an affidavit stating that – with the owner's permission – he had borrowed a vehicle that he had promised to purchase the next day. Id. at 335. Agents recovered cocaine behind a panel covering the vehicle's rear door. Id. The Second Circuit remanded the case to the district court for further fact-finding regarding whether the defendant had established a legitimate expectation of privacy in the space behind the vehicle's door panel. Id. at 337-38. In remanding , the Circuit noted that "[i]t would clearly be unreasonable to anticipate that the ordinary borrower of a car would have the right to peel back an aesthetic carpeting or covering, remove screws with the aid of a screwdriver, lift off the door panel, slip items into the door cavity, and repeat the process in reverse." Id. at 338 (emphasis in original).

Here, assuming arguendo the truth of Sandy Gomez's account that he was tasked with delivering the Yukon to Louisiana, it is not reasonable to conclude that he would have been

authorized to access the Yukon's secret compartment. Indeed, in papers filed in support of his suppression motion, Sandy Gomez continues to deny any knowledge that the Yukon contained a secret compartment. (See S. Gomez Decl. (Dkt. No. 33) ¶ 7; S. Gomez Supp. Decl. (Dkt. No. 56) ¶ 6) Accordingly, granting his suppression motion would require this Court to make the anomalous finding – in the context of an automobile search – that Gomez had a reasonable expectation of privacy in an area of the Yukon that he claims he never knew existed.

Moreover, the trap at issue could not be easily accessed by an "ordinary" driver charged with delivering the vehicle to another location. The trap was operated through the use of hydraulic pistons. In order to open the trap, someone in the driver's seat must – in a particular sequence – press the unlock button or the window button. When these devices are pressed in the appropriate sequence, the cushion of the rear seat lifts up from the back. Trooper Whittaker was unable to gain access to the trap on his own. A DEA agent present at the scene "had the sequence to open [the trap]," however, and the trooper obtained this information and thereby gained access to the trap. (Hearing Tr. (Dkt. No. 51) at 70, 94-95, 117). In sum, access to the trap was not available to the ordinary driver, and – as Pena states – this factor weighs against a finding that a driver such as Gomez had a reasonable expectation of privacy in the trap.

Given that Sandy Gomez denies any knowledge of the Yukon's secret compartment or its contents, and given that the secret compartment would not have been accessible to the "ordinary" person charged with delivering the vehicle to another location, Sandy Gomez has not demonstrated that he had a reasonable expectation of privacy in the secret compartment or its contents. See Pena, 961 F.2d at 338; Pena Ontiveros, 547 F. Supp. 2d at 330. Accordingly, he lacks standing to object to a search of the trap and its contents. In any event, as

discussed below, Trooper Whittaker's stop of the Yukon was supported by reasonable suspicion, and Sandy Gomez consented to a search which led to the discovery of the cocaine.

### B.    Whether the Traffic Stop of the Yukon Was Supported by Reasonable Suspicion

#### 1.    Applicable Law

"The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person." Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005) (citing Whren v. United States, 517 U.S. 806, 809-10 (1996)). The Second Circuit has emphasized that "traffic stops are reasonable when they arise from the reasonable suspicion of a traffic violation." United States v. Stewart, 551 F.3d 187, 192 (2d Cir. 2009). "'The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop.'" United States v. Bristol, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011) (quoting United States v. Stewart, 604 F. Supp. 2d 676, 680 (S.D.N.Y. 2009)). "Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." Holeman, 425 F.3d at 190 (quoting Whren, 517 U.S. at 813).

#### 2.    Analysis

Sandy Gomez claims that he "had committed no traffic violation . . . before [he] was pulled over." (S. Gomez Decl. (Dkt. No. 33) ¶ 2) Trooper Whittaker testified, however, that he observed the Yukon "cross[] over the center dashed line of the roadway with its left tires" as it passed him,[9] and that the driver did not activate the Yukon's turn signal. (Hearing Tr. (Dkt. No.

---

[9] This violation was not captured on the dashboard video camera because it occurred more than thirty seconds prior to Trooper Whittaker's activation of his vehicle's flashing lights. (See supra, note 4)

51) at 44-45)  Gomez does not dispute Trooper Whittaker's testimony that such conduct constitutes a violation of Louisiana Revised Statute 32:79.  Id.; see also La. Stat. Ann. § 32:79 ("A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.").

Trooper Whittaker further testified that the driver of the Yukon committed a second violation of Section 32:79 when the Yukon's "right tires hit the fog line."  (Hearing Tr. (Dkt. No. 51) at 44)  Due to the dashboard video camera's position and the low quality of the video, it is not possible to determine from the video whether the Yukon's wheels hit the fog line. However, just prior to Trooper Whittaker's initiation of the traffic stop, the Yukon clearly shifts to the right side of its lane, near the fog line.  (GX 2 at 0:20-0:30)  Given Trooper Whittaker's testimony and the video evidence, the Court concludes that it is more likely than not that the Yukon made contact with the fog line.  It is also worth noting that Trooper Whittaker is heard on the video recording telling Sandy Gomez that he initiated the stop because the Yukon had hit the fog line.[10]  (Id. at 2:14-2:24)

The Court concludes that Trooper Whittaker's stop of the vehicle driven by Sandy Gomez was justified by his reasonable suspicion that Sandy Gomez had committed a traffic violation.

---

[10]  Even if the Yukon's tires never came into contact with the fog line, the evidence establishes that Trooper Whittaker reasonably believed that a traffic violation had occurred.  See United States v. Jenkins, 452 F.3d 207, 212 (2d Cir. 2006) ("The constitutional validity of a stop is not undermined simply because the officers who made the stop were mistaken about relevant facts.").

### C.   Whether the Traffic Stop was Improperly Prolonged

#### 1.   Applicable Law

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed."[11] Id. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Id. at 1615 (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id.

The Rodriguez court concluded, however, "that the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." Id. (citing Arizona v. Johnson, 555 U.S. 323, 327-28 (2009); Caballes, 543 U.S. at 406, 408). Moreover, "[a] traffic stop may be extended for investigatory purposes if an officer develops a reasonable

---

[11] Prior to the Supreme Court's decision in Rodriguez, the "Second Circuit ha[d] held that, when an officer makes queries unrelated to the justification of a lawful traffic stop, the stop does not become unconstitutional if those queries extend the stop by no more than five or six minutes." United States v. Bernacet, No. 11 Cr. 107 (LTS), 2011 WL 10895014, at *2 (S.D.N.Y. Sept. 7, 2011) (citing United States v. Harrison, 606 F.3d 42, 45 (2d Cir. 2010) (finding such inquiries "did not prolong the stop so as to render it unconstitutional")), aff'd, 724 F.3d 269 (2d Cir. 2013); see also United States v. Lopez, 553 F. App'x 10, 12 (2d Cir. 2014) (holding that "less than five minutes" of questioning prior to requesting consent to pat-down defendant "did not 'measurably extend the duration of the stop'"). The Rodriguez court rejected that reasoning, however, vacating an Eighth Circuit opinion that had upheld a "seven- or eight-minute delay" for purposes of a canine search. Rodriguez, 135 S. Ct. at 1614, 1617.

suspicion of criminal activity supported by specific and articulable facts." United States v.

Foreste, 780 F.3d 518, 523 (2d Cir. 2015); see also Rodriguez, 135 S. Ct. at 1615 (noting that an

officer "may not . . . prolong[] the stop, absent the reasonable suspicion ordinarily demanded to

justify detaining an individual").

### 2.    **Analysis**

Sandy Gomez argues that "[t]he extension of the unlawful traffic stop in order to

conduct a search and a dog sniff based upon a hunch that Mr. Gomez was transporting narcotics,

violates the Constitution's shield against unreasonable seizures." (S. Gomez Post-Hearing Br.

(Dkt. No. 59) at 18)  The Government contends that the length of the stop was justified by

Trooper Whittaker's reasonable suspicion of criminal activity.  (Govt. Post-Hearing Br. (Dkt.

No. 61) at 31-32)

Trooper Whittaker's traffic stop began in a routine manner.  After directing Sandy

Gomez to exit the vehicle,[12] Trooper Whittaker asked him for his driver's license.  Trooper

Whittaker can be heard on the video explaining to Sandy Gomez that he pulled the Yukon over

because it had veered into the fog line.  (GX 2 at 2:14-2:24)  After Gomez volunteered that he

had been watching a game in New Orleans, Trooper Whittaker asked which team won and by

what score.  Sandy Gomez could not answer either question.  (Id. at 2:25-2:58)  Trooper

Whittaker then asked the passenger, Ramon-Baez, for the vehicle's registration.  (Hearing Tr.

(Dkt. No. 51) at 51)  The trooper also questioned Ramon-Baez about the circumstances of her

and Sandy Gomez being in Louisiana; Ramon-Baez said that they had come from Alabama.

(Id.)  Sandy Gomez had reported that they had driven down from North Carolina, however.  (Id.;

---

[12]  The Supreme Court has held "that an officer making a traffic stop may order passengers to get
out of the car pending completion of the stop."  Maryland v. Wilson, 519 U.S. 408, 415 (1997).

GX 2 at 3:14-3:23)  Trooper Whittaker then returned to his vehicle to conduct record checks on

Sandy Gomez and Ramon-Baez.  (Hearing Tr. (Dkt. No. 51) at 53; see also GX 2 at 4:40-4:52)

After completing these checks – which revealed nothing noteworthy – Trooper Whittaker had

completed the mission of a typical traffic stop.  In this case, however, Trooper Whittaker was

aware of other information that – together with his observations at the scene – gave him

reasonable suspicion to justify a continued detention.

   Prior to the traffic stop, the DEA had communicated to Trooper Whittaker the

make, model, color and license plate number of the vehicle driven by Sandy Gomez, along with

the following additional information:  (1) the Yukon being driven by Sandy Gomez was owned

by the DEA; (2) the vehicle was equipped with a secret compartment or "trap"; and (3) the

targets of the investigation had obtained the Yukon from the DEA for the purpose of using it to

transport cocaine from New Orleans to New Jersey; and (4) the cocaine would be hidden in the

trap of the vehicle.[13]  (Hearing Tr. (Dkt. No. 51) at 43)  In carrying out the "mission" of a routine

traffic stop, Trooper Whittaker made the following observations:  (1) Sandy Gomez appeared

---

[13]  Although Sandy Gomez claims that "Trooper Whittaker made the traffic stop without
knowledge that there was a DEA investigation in progress" (S. Gomez Post-Hearing Br. (Dkt.
No. 59) at 14), Trooper Whittaker testified to the contrary (see Hearing Tr. (Dkt. No. 51) at 42-
43), and this Court credits his testimony.  Even if Trooper Whittaker had not been informed of
the details of the DEA's investigation, however, "[t]he existence of probable cause [or
reasonable suspicion] need not be assessed on the basis of [his] knowledge" alone.  Zellner v.
Summerlin, 494 F.3d 344, 369 (2d Cir. 2007).

> Under the collective or imputed knowledge doctrine, an arrest or search is
> permissible where the actual arresting or searching officer lacks the specific
> information to form the basis for probable cause or reasonable suspicion but
> sufficient information to justify the arrest or search was known by other law
> enforcement officials initiating or involved with the investigation.

United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001).

nervous; (2) Gomez volunteered that he had come to New Orleans to watch a game, but when asked which team won and the score, Gomez replied that he "lost track"; and (3) when asked where they had come from, Gomez and Ramon-Baez gave inconsistent answers – Gomez said that they had come from North Carolina, while Ramon-Baez reported that they had driven from Alabama.  Given the information provided to Trooper Whittaker before the traffic stop, and the additional observations he made at the scene of the stop, the trooper had reasonable suspicion to believe that Gomez and Ramon-Baez might be involved in narcotics trafficking.  See United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996) ("officers had reasonable suspicion" where, inter alia, they "noted [an] inconsistency in [defendant]'s statements as to his address and observed his apparent nervousness"); United States v. Tehrani, 49 F.3d 54, 59 (2d Cir. 1995) (reasonable suspicion existed where, inter alia, defendant's "answers were inconsistent with the answers of his known travelling companion"); United States v. Santillan, No. 13 CR 138 (RWS), 2015 WL 6115865, at *1-2 (S.D.N.Y. Oct. 15, 2015) (finding reasonable suspicion where, inter alia, vehicle's occupants acted nervously and provided incomplete answers regarding their travels); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 2344007, at *2 (E.D.N.Y. May 14, 2015) (vehicle occupants' "inconsistent answers about their travel plans and the ownership of the vehicle" were "indicia of criminal activity"); see also United States v. Murphy, 703 F.3d 182, 192 n.7 (2d Cir. 2012) ("Stahl's various observations – that Webster appeared nervous, that Murphy provided inconsistent answers about their travel route, and that the car smelled of fresh paint – might have aroused reasonable suspicions of drug activity by the time he asked for consent to search the car. . . .").

Because Trooper Whittaker had "reasonable suspicion" that Sandy Gomez was engaged in criminal activity, the law permitted him to extend the stop to continue his

22

investigation. <u>Santillan</u>, 2015 WL 6115865, at *1 ("Where an officer does have reasonable suspicion, however, nothing in <u>Rodriguez</u> limits his or her ability to reasonably prolong the stop to conduct an investigation of criminal activity." (citing <u>Rodriguez</u>, 135 S. Ct. at 1615)).

D.   **Whether Sandy Gomez's Consent**
**to Search Was Knowing and Voluntary**

1.   **Applicable Law**

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).

> The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary. <u>United States v. Calvente</u>, 722 F.2d 1019, 1023 (2d Cir. 1983). Voluntariness is a question of fact determined by a "totality of all the circumstances." <u>Schneckloth</u>, 412 U.S. at 227. "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" <u>United States v. Garcia</u>, 56 F.3d 418, 423 (2d Cir. 1995) (quoting <u>United States v. Sanchez</u>, 32 F.3d 1330, 1334 (8th Cir.1994)); <u>see</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

<u>United States v. Isiofia</u>, 370 F.3d 226, 230-31 (2d Cir. 2004).

In making a voluntariness determination, courts should consider the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights." <u>United States v. Puglisi</u>, 790 F.2d 240, 243 (2d Cir. 1986) (citing <u>Schneckloth</u>, 412 U.S. at 226). "A person placed in official custody is not thereby rendered incapable of giving his free and voluntary consent to a warrantless search." <u>United States v. Moreno</u>, 897 F.2d 26, 33 (2d Cir. 1990).

"[T]he government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness." United States v. Schaefer, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012); see United States v. Drayton, 536 U.S. 194, 206-07 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."). Finally, a defendant may consent to a search even if he has not been informed in advance of his Miranda rights. See Moreno, 897 F.2d at 33 ("The fact that Moreno was not informed of his Miranda rights prior to the search does not affect our conclusion, since Miranda does not 'require[ ] the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent.'" (quoting Schneckloth, 412 U.S. at 246)).

2.     **Analysis**

Trooper Whittaker testified that Sandy Gomez provided both verbal and written consent to a search of the Yukon. (Hearing Tr. (Dkt. No. 51) at 54-55)  The video obtained from the trooper's dashboard camera corroborates the trooper's account.  On the video, Trooper Whittaker can be heard asking Sandy Gomez whether he "ha[s] any problems with [Trooper Whittaker] searching real quick." (GX 2 at 13:45-13:49)  Gomez replies, "No." (Id.)  Although Gomez claims that he said "'no' [to] indicat[e] [that] there was nothing there and not to search" (Sandy Gomez Decl. (Dkt. No. 33) ¶ 4), this assertion is not consistent with the video evidence, much less Trooper Whittaker's testimony, which this Court finds credible.  After Gomez responded "no" to Trooper Whittaker's question about whether he had any problem with a search, the trooper immediately presented a written consent form to Gomez and reviewed the form with him.  (GX 2 at 13:49-14:10; see also Hearing Tr. (Dkt. No. 51) at 55)  If Gomez had

24

indeed refused consent, or intended to do so, it is odd that he did not object or express any surprise when Trooper Whittaker produced the written consent form. The Court concludes that Gomez verbally consented to a search of the Yukon.

As to written consent, Gomez asserts that he could not read the consent form "because it was dark." (S. Gomez Decl. (Dkt. No. 33) ¶ 4) The area where Gomez was standing was well-lit by the patrol car's headlamps and flashing lights, however. (GX 2 at 13:50-14:10) Moreover, Trooper Whittaker testified that Gomez "appear[ed] to read the form before he signed it," and did not "indicate that he did not understand [it]." (Hearing Tr. (Dkt. No. 51) at 56)

The consent form – which is entitled "Consent to Search" – consists of only eight lines of text, and says little more than that the individual signing the form (1) "voluntarily authorize[s]" the state police to conduct a search; and (2) has the right to "refuse to consent to any search" and "may revoke . . . consent at any time." (GX 3) Trooper Whittaker also testified that he "went over the form with [Gomez]," and told Gomez "that he had the right to refuse . . . consent if he chose to do so, and even if he gave . . . consent, at any time during the search, he had the right to revoke that consent." (Id. at 55-56) Gomez never objected to the search or expressed any reservations about it.[14] The Court concludes that Sandy Gomez knowingly provided written consent to search, and that he was informed – prior to providing written consent – of his right to (1) refuse to consent to any search; and (2) revoke consent to search at any time. (GX 3)

---

[14] Trooper Whittaker later informed Gomez that a canine search would take place. (Hearing Tr. (Dkt. No. 51) at 65) Although Gomez claims that he "did not consent" to the canine search (S. Gomez Decl. (Dkt. No. 33) ¶ 5), there is no evidence that he objected to such a search, despite the fact that he had been informed of his right to revoke consent at any point.

Gomez argues, however, that "his consent was involuntary," because "[a]lthough [he] was not in handcuffs at the time he signed the consent form, he was in custody[,] and thus, Miranda warnings were required prior to obtaining his signature on the consent form." (S. Gomez Post-Hearing Br. (Dkt. No. 59) at 19-20) The record does not demonstrate that Gomez was "in custody," however. Gomez was not placed in handcuffs or restrained in any other way; was not told that he was under arrest; was not subjected to a show of force; was not threatened in any way; and was not told that he was not free to go.[15] See United States v. Santillian, No. 13 CR. 138 (RWS), 2013 WL 4017167, at *12 (S.D.N.Y. Aug. 7, 2013) (finding consent voluntary where defendant "had been detained for approximately seventeen minutes, . . . questioned by [an officer], patted-down and frisked, had his phone, wallet and identification removed, and was in the backseat of the patrol car"); United States v. Reyes, No. 11 CR. 58 (RJH), 2012 WL 363042, at *6 (S.D.N.Y. Feb. 1, 2012) (finding consent voluntary where "[t]here [was] no indication that the agents threatened Reyes into giving his consent," "[n]one of the agents drew their guns, Reyes was not physically restrained, and there is no evidence that any agent said anything to Reyes to suggest that his refusal to give consent would have negative consequences"); United States v. Fernandez-Jimenez, No. 03 Cr. 1493 (RPP), 2004 WL 1598653, at *4 (S.D.N.Y. July 16, 2004) ("Though [d]efendant was detained pursuant to a traffic stop, and was not informed of his right to decline the search, his cooperative behavior and the calm, non-threatening behavior of Officer Santiago and Det. Klie are evidence that the consent was voluntary.").

Moreover, Trooper Whittaker obtained Gomez's consent to search less than fifteen minutes into the traffic stop (GX 2 at 13:45-14:10), and the entire interaction took place

---

[15] Trooper McKay stood "[o]ff to the right side of [Trooper Whittaker's] vehicle" while Trooper Whittaker explained the form to Gomez. (Hearing Tr. (Dkt. No. 51) at 57) Trooper McKay was not holding his weapon, however, and did not restrain Gomez in any way. (Id.)

26

"in a public area" – the shoulder of a well-traveled interstate highway – "not in an interrogation room or a stationhouse." Moreno, 897 F.2d at 33 (considering length of encounter and public setting in finding consent voluntary); see also Fernandez-Jimenez, 2004 WL 1598653, at *4 (noting, inter alia, that "the stop occurred on a public street in Manhattan in the evening" in finding consent voluntary). The Court concludes that the Government has met its burden to demonstrate that Sandy Gomez's consent to search was knowing and voluntary.

E.    **Suppression of Sandy Gomez's Statements**

Sandy Gomez has moved to suppress all statements he made to law enforcement officers during the traffic stop, whether made before or after he was told that he was under arrest. (S. Gomez Post-Hearing Br. (Dkt. No. 59) at 22) Sandy Gomez argues that he "was deprived of his freedom of movement when the trooper blocked his path to his vehicle, while the other trooper stood close to [Gomez] with his hand on his gun holster." (S. Gomez Br. (Dkt. No. 35) at 9) Gomez further contends that he was subjected to a custodial interrogation "without proper Miranda warnings." (Id.)

As an initial matter, it is not clear that the Government will seek to introduce any of Sandy Gomez's statements – whether pre- or post-arrest. Both before and after his arrest, Gomez consistently denied any knowledge that the Yukon contained drugs, cash, or other contraband. (GX 2 at 13:22-13:45) Gomez also denied knowing what was inside the trap and – when the cocaine was discovered – denied any knowledge of the cocaine. (Hearing Tr. (Dkt. No. 51) at 69-72) The Court will nonetheless consider whether any of Sandy Gomez's statements must be suppressed because of a Miranda violation.

27

1.    **Applicable Law**

"[A] suspect is[, of course,] entitled to <u>Miranda</u> warnings . . . if he . . . is

interrogated while 'in custody.'" <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 242-43 (2d Cir. 1998)

(citing <u>Thompson v. Keohane</u>, 516 U.S. 99, 100-01 (1995)); <u>see</u> <u>United States v. Newton</u>, 369

F.3d 659, 669 (2d Cir. 2004) ("<u>Miranda</u>'s warning requirements apply . . . to 'custodial

interrogation.'" (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966))).  For purposes of

<u>Miranda</u>, "'[a]n accused is in custody when, even in the absence of an actual arrest, law

enforcement officials act or speak in a manner that conveys the message that they would not

permit the accused to leave.'" <u>Tankleff</u>, 135 F.3d at 244 (2d Cir. 1998) (quoting <u>United States v.</u>

<u>Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995)).

The Second Circuit uses a two-step objective test to determine whether a suspect

is in custody:

> The first step requires consideration of whether a reasonable person in the
> defendant's position would have understood that he or she was free to leave.
> <u>Newton</u>, 369 F.3d at 670.  Among the factors relevant to this determination are
> whether the suspect is told that he is free to leave, the location and atmosphere of
> the interrogation, the language and tone used by the law enforcement officers,
> whether the suspect is searched or frisked, and the length of the interrogation.
> <u>Tankleff</u>, 135 F.3d at 244; <u>see also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437-38
> (1984); <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494-95 (1977); <u>Campaneria v. Reid</u>,
> 891 F.2d 1014, 1021 n.1 (2d Cir.1989); <u>United States v. Guarno</u>, 819 F.2d 28, 31-
> 32 (2d Cir. 1987).  The second step, and the "ultimate inquiry," <u>Newton</u>, 369 F.3d
> at 670, looks to whether there was a restraint of freedom of movement akin to that
> associated with a formal arrest. <u>Id.</u>

<u>United States v. Guzman</u>, 724 F. Supp. 2d 434, 445 (S.D.N.Y. 2010).  The Second Circuit has

noted, however, that "<u>Miranda</u> warnings need not be given for interrogation during ordinary

traffic stops." <u>United States v. Wong Ching Hing</u>, 867 F.2d 754, 756 (2d Cir. 1989) (citing

<u>Berkemer</u>, 468 U.S. at 437-39); <u>see also</u> <u>Georgison v. Donelli</u>, 588 F.3d 145, 157 n.4 (2d Cir.

2009) ("'[A] motorist who has been stopped by the police for a traffic infraction is clearly not free

to leave the confrontation, yet Miranda rights are not implicated." (citing Berkemer, 458 U.S. at 440)).

"To prove a valid waiver [of Miranda rights], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'" United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting Moran, 475 U.S. at 421). "The government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional rights." United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996) (citing United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)).

"'Even absent the accused's invocation of [his Miranda rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement.'" United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011) (quoting Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)).

"The waiver inquiry, itself, has two 'distinct' components." Id. First, the waiver must be "knowing," which means that "'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Moran, 475 U.S. at 421). Second, the waiver must be voluntary. "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate

choice rather than intimidation, coercion, or deception.'" Male Juvenile, 121 F.3d at 41 (quoting

Moran, 475 U.S. at 421).   Voluntariness is evaluated in light of "the totality of all the

surrounding circumstances, including the accused's characteristics, the conditions of

interrogation, and the conduct of law enforcement officials" to determine whether "the

defendant's will was overborne by the [police officers'] conduct." Anderson, 929 F.2d at 99; see

Lynch, 92 F.3d at 65 (applying this analysis to determine "[w]hether a defendant knowingly and

voluntarily waived his rights").   "Coercive police activity is 'a necessary predicate' to finding

that a waiver of Miranda rights was not voluntary." Coronado v. Lefevre, 748 F. Supp. 131, 139

(S.D.N.Y. 1990) (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)).   "'The question of

waiver must be determined on the particular facts and circumstances surrounding [the] case,

including the background, experience, and conduct of the accused.'" Plugh, 648 F.3d at 127

(quoting United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam)).

### 2.    Analysis

The Court finds that Sandy Gomez was arrested after the canine alerted to the trap

in the Yukon, and further concludes that Trooper Whittaker administered Miranda warnings to

Gomez at that time.   (Hearing Tr. (Dkt. No. 51) at 69)

With respect to statements made by Gomez prior to the administration of Miranda

warnings, the Court concludes that Gomez was not in custody at that time.   Gomez was not told

that he was under arrest; he was not restrained or subjected to force in any way; neither trooper

drew his weapon; and neither trooper indicated by words or action that Gomez was not free to

go.   The questioning at issue also took place less than fifteen minutes into the traffic stop, a fact

that weighs against Gomez's argument that he was "in custody."   See Wong Ching Hing, 867

F.2d at 755-56 (finding that "statements . . . made within a half-hour after the car was stopped"

30

"were admissible without <u>Miranda</u> warnings because the defendant was not in 'custody'");

<u>United States v. Bridges</u>, No. 00 CR. 210 (HB), 2000 WL 1170137, at *8 (S.D.N.Y. Aug. 16,

2000) (concluding that defendant was not in custody where "[t]he actual interviews, <u>i.e.</u> the

period of time that [the defendant] was questioned, were not lengthy"). The fact that, "at the

time of the roadside questioning, [Gomez was] stopped on a public highway," also weighs

against his custody argument. <u>Santillian</u>, 2013 WL 4017167, at *13 (noting this fact in

concluding that "[d]efendants were not 'in custody' for the purposes of <u>Miranda</u>").

   In his declaration, Sandy Gomez states that "he did not believe that [he] could

simply leave," noting that Trooper Whittaker was "blocking [Gomez's] path" to his vehicle. (S.

Gomez Decl. (Dkt. No. 33) ¶ 4; <u>see</u> <u>also</u> S. Gomez Br. (Dkt. No. 35) at 9)  Gomez's subjective

belief that he could "not . . . simply leave" (S. Gomez Decl. (Dkt. No. 33) ¶ 4) is insufficient to

overcome the objective facts discussed above, however.  <u>See</u> <u>United States v. Faux</u>, No. 15-

1282-CR, 2016 WL 3648331, at *4 (2d Cir. July 8, 2016) ("An individual's subjective belief

about his or her status generally does not bear on the custody analysis."); <u>see</u> <u>also</u> <u>Stansbury v.</u>

<u>California</u>, 511 U.S. 318, 323 (1994) ("Our decisions make clear that the initial determination of

custody depends on the objective circumstances of the interrogation, not on the subjective views

harbored by either the interrogating officers or the person being questioned.").  In any event, the

dashboard video refutes Gomez's claim that Trooper Whittaker was blocking Gomez's return to

his vehicle.  (GX 2 at 12:00-14:10)

   In sum, there is no evidence that – prior to the canine search – Gomez was subject

to a restraint on his freedom of movement akin to that associated with a formal arrest.  <u>See</u>

<u>United States v. Bethea</u>, No. 15-CR-417 (DLI), 2016 WL 3248305, at *6 (E.D.N.Y. June 8,

2016) ("Thus, because [the defendant] was not in custody until the moment he was handcuffed,

the statements [the defendant] made while still inside the Vehicle . . . , and the statements [the defendant] made while at the rear of the Vehicle . . . are admissible."); United States v. Chin, No. 5:13-CR-28, 2013 WL 5406239, at *11-12 (D. Vt. Sept. 26, 2013) (finding that defendant was not "in custody" where he "was asked only a few questions in a public location with access to his traveling companions and passersby," and "[t]he officers did not draw their weapons, and they did not advise [d]efendant that he was not free to leave or under arrest"); United States v. Molina, 368 F. Supp. 2d 308, 312 (S.D.N.Y. 2005) ("despite the [presence of nine] law enforcement officers . . . , the testimony did not suggest that they were positioned around [the defendant] and the other occupants of the bus in such a way that a reasonable person would believe he was being held or under arrest"); United States v. Perez, No. 01 CR. 848 (SWK), 2002 WL 1835601, at *7 (S.D.N.Y. Aug. 8, 2002) (presence of three officers during a traffic stop "did not create a custodial situation").

About forty minutes into the traffic stop – and after the canine search – Trooper Whittaker can be heard on the dashboard video informing Sandy Gomez that he would be detained because "the dog [had] alerted . . . to the presence of some type of narcotics." (GX 2 at 40:08-40:26)  Trooper Whittaker tells Gomez that "[t]here is a compartment in that car" and asks, "Do you know what a hidden compartment is?"  (Id. at 40:26-40:33)  Gomez responds, "Yeah, [U/I] I understand what you're saying."[16]  (Id. at 40:34-40:37)

Trooper Whittaker then administered the following warnings to Gomez:

---

[16]  Gomez's response to Trooper Whittaker's question about hidden compartments will be suppressed, because Gomez was "in custody" at that point.  Trooper Whittaker had told Gomez that (1) the canine had alerted to the presence of narcotics in the Yukon; (2) there was a hidden compartment in the vehicle; and (3) he would be detained.  At that point, the traffic stop had continued for approximately forty minutes.  A reasonable person in Gomez's position would not have felt free to leave at that point.  See Tankleff, 135 F.3d at 244.

Now, I'm gonna go ahead and tell you what your rights are. Alright? You do have the right to remain silent. Anything you say, can and will be used against you in a court of law. And you have the right to the presence of an attorney prior to answering any questions or giving any statements, okay? If you can't afford an attorney, one will be appointed to represent you. Alright? And, if at any time you want to stop answering questions, you have the right to do that too.

(Id. at 40:43-41:05)

After giving these warnings to Gomez, Trooper Whittaker asked, "What's in the compartment?" (Id. at 41:05-41:08) Gomez told the trooper that he did not know what was inside the compartment, explaining that he had borrowed the vehicle. (Hearing Tr. (Dkt. No. 51) at 69) After cocaine was recovered from the trap, Gomez denied any knowledge of the drugs. (Id. at 72)

The Court concludes that Miranda warnings were administered to Gomez, that he understood his rights, and that any statements Gomez made after receiving Miranda warnings were voluntary. The dashboard video demonstrates that Trooper Whittaker spoke with Gomez in a normal, conversational tone. There is no evidence that the troopers threatened Gomez or intimidated him in any way. Indeed, Gomez does not allege police coercion. See Plugh, 648 F.3d at 128 ("[W]e have no reason to doubt the voluntariness of that waiver or the ensuing, inculpatory statements. Certainly [the defendant] does not claim that the officers threatened him or that he was intimidated in any way."). With respect to whether Gomez's waiver was knowing and intelligent, "Miranda requires only that warnings be given and that the defendant understand the consequence of their waiver." United States v. James, No. 94 CR. 750 (AGS), 1995 WL 330651, at *4 (S.D.N.Y. June 2, 1995). There is no evidence that Gomez did not understand the Miranda warnings. (Hearing Tr. (Dkt. No. 51) at 68) To the contrary, Gomez can be heard saying "mmhmm" in acknowledgement as Trooper Whittaker reads the warnings.

33

This Court is "satisfied that 'with a full understanding of his . . . rights' [Gomez] acted 'in a manner inconsistent with their exercise' when he chose to begin speaking with [Whittaker] . . . , and, as such made a 'deliberate choice to relinquish the protections those rights afford.'" Plugh, 648 F.3d at 128 (quoting Berghuis, 560 U.S. at 385). Accordingly, Gomez's motion to suppress his statements to law enforcement officers will be denied, except as to his statement in response to Trooper Whittaker's question about hidden compartments.

## II.   MOTION FOR RULE 404(b) MATERIAL

Sandy Gomez requests disclosure of evidence that the Government "will seek to introduce . . . pursuant to Federal Rule of Evidence 404(b) in sufficient and reasonable time . . . [to] make a 404(b) motion to preclude the introduction of such evidence." (S. Gomez Notice of Motion (Dkt. No. 32) ¶ 3)

"Rule 404(b) only requires 'reasonable notice in advance of trial' for the admission of prior convictions and bad acts." United States v. Russo, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007). "The rule establishes no minimum time . . . because 'the evidence the government wishes to offer may well change as the proof and possible defenses crystallize.'" Id. (quoting United States v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988)). Here, the Government has represented that "it will provide appropriate Rule 404(b) notice in a timely fashion in order to permit the defendant an opportunity to challenge admission of such evidence and to permit the Court to make an appropriate finding." (Govt. Br. (Dkt. No. 37) at 28) Accordingly, there is no need to issue the order requested by Gomez, and his motion concerning Rule 404(b) material will be denied. See Russo, 483 F. Supp. 2d at 309 ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence . . . before the beginning of trial. . . . There is therefore no need to issue

the order Defendants seek."); United States v. Ramirez, No. S 91 Cr. 493 (KMW), 1991 WL

177239, *2 (S.D.N.Y. August 30, 1991) ("The government has represented that it will provide

timely notice of any intent to introduce [404(b)] evidence so that there is no need to issue the

order defendant seeks.").

## III.    MOTION FOR EXCULPATORY AND IMPEACHMENT EVIDENCE

Sandy Gomez seeks production of exculpatory evidence under Brady v.

Maryland, 373 U.S. 83 (1963), as well as evidence that would be useful to impeach the

credibility of Government witnesses under Giglio v. United States, 405 U.S. 150 (1972), United

States v. Bagley, 473 U.S. 667 (1985), and Kyles v. Whitley, 514 U.S. 419 (1995).  (S. Gomez

Notice of Motion (Dkt. No. 32) ¶ 4)  The Government has indicated that it "is not aware of any

undisclosed Brady material at this time."  (Govt. Br. (Dkt. No. 37) at 26)

Under the Due Process Clause, the Government has a continuing obligation to

provide Brady material to a defendant.  Brady, 373 U.S. at 87.  The Government has

acknowledged its obligation and has indicated that it "will turn over any Brady materials it

uncovers immediately upon discovery."  (Govt. Br. (Dkt. No. 37) at 26)  No more is required.

See United States v. Gallo, No. 98 CR. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11,

1999) (denying motion to compel production of Brady material where "the Government

represents that it is aware of its obligations under Brady . . . and will produce any Brady material

to the defense well before trial").  The Government has also represented that it "will provide

material under Giglio . . . , and its progeny, in a timely manner."  (Govt. Br. (Dkt. No. 37) at 27).

Accordingly, Gomez's motion for production of exculpatory evidence under

Brady, as well as evidence that would be useful to impeach the credibility of Government

witnesses, will be denied.

## IV.    OTHER MOTIONS

Gomez requests an order permitting him to make further motions as may be appropriate, and an order permitting him to join in any motions made by co-defendants.  (S. Gomez Notice of Motion (Dkt. No. 32) ¶¶ 5-6)

With respect to additional pretrial motions, Federal Rule of Criminal Procedure 12(c) states that "[t]he court may . . . set a deadline for the parties to make pretrial motions. . . . If the court does not set one, the deadline is the start of trial. . . .  If a party does not meet the deadline for making a [pretrial] motion, the motion is untimely.  But a court may consider the defense, objection, or request if the party shows good cause."  Fed. R. Crim. P. 12(c).

Here, at a November 10, 2015 conference, the Court set a January 11, 2016 deadline for pretrial motions.  (See Nov. 10, 2015 Tr. (Dkt. No. 23) at 5)  On January 11, 2016, the Court extended the deadline to February 10, 2016, because the Government had not completed production of Rule 16 material.  (Dkt. No. 27)  Gomez does not explain why the February 10, 2016 deadline should be disregarded, nor does he identify any potential motions that he wishes to file.  Accordingly, his motion will be denied.

With respect to Gomez's request for permission to join in motions made by co-defendants, none of Gomez's co-defendants filed pretrial motions.  Accordingly, this request will be denied as moot.

## CONCLUSION

For the reasons stated above, Sandy and Jorge Gomez's pretrial motions are denied, except as to Sandy Gomez's motion to suppress his statement in response to Trooper Whittaker's question about hidden compartments.  The statement made in response to that

question will be suppressed.  The Clerk of the Court will terminate the motions (Dkt. Nos. 32, 36).

The Court will conduct a pretrial conference in this matter on August 15, 2016, at 11:00 a.m. in Courtroom 705, 40 Foley Square, New York, N.Y.

Dated: New York, New York
      July 29, 2016

                                      SO ORDERED.

                                        Paul G. Gardephe
                                        United States District Judge

37