UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JORGE GOMEZ,

                Petitioner,

           - v. -

UNITED STATES OF AMERICA,

                Respondent.

**ORDER**

17 Civ. 6190 (PGG)

15 Cr. 348 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          On October 11, 2016, Petitioner Jorge Gomez pled guilty to conspiracy to distribute and possess with intent to distribute five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).[1]  On April 14, 2017, this Court sentenced Gomez to 155 months' imprisonment and five years' supervised release.  (See No. 15 Cr. 348, Judgment (Dkt. No. 160))  On August 15, 2017, Gomez moved, pursuant to 28 U.S.C. § 2255, to vacate his sentence.  This Court denied that motion on December 20, 2019.  (No. 17 Civ. 6190, Mot. (Dkt. No. 1); Dec. 20, 2019 Order (Dkt. No. 36))  Gomez has moved for reconsideration, or in the alternative, for the issuance of a certificate of appealability.  For the reasons stated below, Gomez's application will be denied.

**BACKGROUND**

**I.**      **INDICTMENT AND PLEA**

          Indictment 15 Cr. 348 (PGG) was filed on June 10, 2015, and charges Jorge Gomez, Sandy Gomez, Carolina Ramon-Baez, and others with conspiracy to distribute and to

---

[1]  Gomez entered his plea before Magistrate Judge Gorenstein, and this Court accepted the plea on October 28, 2016.  (See No. 15 Cr. 348, Order (Dkt. No. 110))

possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C.

§§ 846 and 841(b)(1)(A).  (No. 15 Cr. 348, Indictment (Dkt. No. 1))

### A.  Plea Agreement

On October 5, 2016, Gomez entered into a plea agreement in which he agreed to

plead guilty to the Indictment.  (No. 15 Cr. 348, Dkt. No. 195, Ex. 2 (Plea Agreement))  In the

plea agreement, Gomez and the Government entered into the following stipulations concerning

application of the Sentencing Guidelines:  (1) the base offense level is 30, because Gomez's

offense involved between five and fifteen kilograms of cocaine; (2) a two-level enhancement

applies pursuant to § 2D1.1(b)(1), because Gomez had provided a firearm to a co-conspirator to

protect their drug business; (3) a three-level reduction pursuant to § 3E1.1(a) and (b) is

appropriate, because of Gomez's acceptance of responsibility.  Pursuant to these calculations, the

parties agreed that Gomez's total offense level is 29.  (Id. at 2)

The parties also stipulated that – "[b]ased upon the information now available to

[the U.S. Attorney's] Office (including representations by the defense)" – Gomez has 10

criminal history points, placing him in Criminal History Category V.  (Id.)  The parties further

agreed that at offense level 29 and Criminal History Category V, Gomez's Guidelines range is

140 to 175 months' imprisonment, with a mandatory minimum term of 120 months'

imprisonment.  (Id. at 3)

The parties agreed that neither a downward nor an upward departure from the

Stipulated Guidelines Range would be warranted, but that either side could seek a sentence

outside of the Guidelines Range pursuant to 18 U.S.C. § 3553(a).  (Id. at 3-4)

### B.  Rule 11 Proceeding

On October 11, 2016, Gomez pleaded guilty before Magistrate Judge Gorenstein

pursuant to the plea agreement.  Consistent with Fed. R. Cr. P. 11, Judge Gorenstein advised

Gomez of the nature of the charge against him, his rights and the consequences of pleading guilty – including the penalties he faced – and the key provisions of the plea agreement.  (No. 15 Cr. 348, Plea Tr. (Dkt. No. 106) at 4-9)  Gomez acknowledged that he had discussed the charge and his intention to plead guilty with his attorney, Michael Sporn, and that he was satisfied with Sporn's representation of him.  (Id. at 4).

Gomez also assured Judge Gorenstein that his guilty plea was not influenced by any direct or indirect "force or threats," that he had reviewed all of the terms and conditions of the plea agreement with Sporn prior to signing it, and that his "plea [was] voluntary, that is, made of [his] own free will."  (Id. at 7-9).  Judge Gorenstein also confirmed with Gomez that he understood that the "sentencing judge [would] not be bound by the calculation in the [plea agreement]," but would instead have discretion to consider many factors, including the stipulated Guidelines range, in determining Gomez's sentence.  (Id. at 8-9).

Finally, Gomez was asked to describe, in his own words, the conduct that made him guilty of the charge in the Indictment.  (Id. at 10)  Gomez stated that he "agreed with others to get a vehicle SUV that had a hidden compartment for the purpose of having another person transport cocaine in [the] hidden compartment from the south to the New York/New Jersey area where it [would] have been distributed."  (Id. at 11)  Gomez further stated that he understood that five kilograms of cocaine would be transported in the hidden compartment.  (Id.)

## II.   SENTENCING

### A.   Presentence Investigation Report

The Probation Office issued a Presentence Investigation Report ("PSR") on December 29, 2016.  (No. 15 Cr. 348, PSR (Dkt. No. 136))  In determining the offense level, the Probation Office employed the same calculations set forth in the parties' plea agreement, and

arrived at the same total offense level of 29, the same Criminal History Category, and the same Guidelines range.  (Id. at 10, 17, 23)

       **B.**      <u>**Gomez's Post-Plea Disputes With Counsel**</u>

         In a February 28, 2017 letter, Michael Sporn – Gomez's counsel – informed the Court that Gomez was requesting that new counsel be appointed to represent him.  (No. 15 Cr. 348 (Dkt. No. 144))  At a March 1, 2017 conference, this Court asked Gomez to explain why he wanted Sporn replaced, noting that it was unusual for a defendant to seek a change of counsel between a guilty plea and sentencing.  (No. 15 Cr. 348, March 1, 2017 Conf. Tr. (Dkt. No. 153) at 2)  The following dialogue ensued:

> THE DEFENDANT:  I got issues regarding my sentencing arguments.  They are relevant to my culpability as well as to 3553(a) factors.
>
> THE COURT:  So you have issues with what?
>
> THE DEFENDANT:  My sentencing.  Regarding my sentencing.  I have some issues with him.
>
> THE COURT:  You disagree with him as to the arguments that should be made –
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  – in your favor at sentencing?  Is that what you're saying?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  Without telling me the details of it, have you told Mr. Sporn what your concerns are?
>
> THE DEFENDANT:  Yes.
>
> THE COURT:  And you feel that he hasn't been responsive to those concerns?
>
> THE DEFENDANT:  I feel me and him don't have the same understanding.  It's like a conflict, and it can't be resolved.
>
> THE COURT:  Do you agree with that, Mr. Sporn?

MR. SPORN:  Well, let me say this, Judge.  I think we have a different approach on what ought to be emphasized at the sentencing proceeding, and he's raised some points that he would like me to address.  They are part of the mix, but we have differing perspectives about the significance of those points I suppose in the larger scheme of things.

(Id. at 2-3)

The Court then noted that while Mr. Sporn had made "an entirely professional presentation in support of the request for the minimum possible sentence here, which is ten years," "Mr. Gomez is facing a very serious situation . . . a guidelines range of 140 to 175 months."  Given this context, it was "important to [the Court] that Mr. Gomez feels that he has an advocate with whom he's on the same page and who is presenting the arguments that he feels would be most effective."  (Id. at 4)

The Court warned Gomez that if his application to replace Sporn was granted, "this will be it.  There will be no more lawyers.  You would be assigned another lawyer under the Criminal Justice Act, whoever happens to be on duty today . . . and it would be up to you to build a good relationship with that person, because we can't, as I'm sure you understand, replace lawyers willy nilly, particularly in a situation where . . . you have a fine advocate representing you now, someone who's extremely experienced, who's been practicing in this court for decades, and who knows what he's doing."  The Court then asked Gomez whether it was still his wish that Sporn be replaced.  Gomez said that it was, and the Court then granted his application.  (Id. at 5) Richard Lind was then appointed to represent Gomez.  (No. 15 Cr. 348, March 27, 2017 Def. Ltr. (Dkt. No. 152) at 1)

Gomez had disputes with Lind as well.  In an April 4, 2017 letter, Lind informed the Court that Gomez "wanted to pursue a course of action which [Lind] had previously told [Gomez would be] counterproductive, and which he told me he recognized to be not helpful." (No. 15 Cr. 348, April 4, 2017 Def. Ltr. (Dkt. No. 155) at 1)  Lind requested that "either

additional – or replacement – CJA counsel be appointed to advise Gomez, or that the matter be referred to a Magistrate Judge so that Gomez may take advantage of unbiased guidance."  (Id.)

On April 10, 2017, the Court conducted a hearing concerning Gomez's disputes with Lind.  (No. 15 Cr. 348, Apr. 10, 2017 Conf. Tr. (Dkt. No. 165))  Lind explained that Gomez told him that he had "disposed of Mr. Sporn" after a post-plea effort to cooperate with the Government "did not work out to Mr. Gomez's satisfaction."  (Id. at 5)  Gomez further complained to Lind that he learned only after his guilty plea that the actual amount of cocaine seized "was a couple of grams less than 5 kilos."  (Id. at 6)  Lind had explained to Gomez that – given that he had pled guilty to a conspiracy count – the fact that the actual amount of cocaine seized was 4.98 kilograms rather than five kilograms was of little import.  (Id.)  Gomez nonetheless was pressing Lind to move to withdraw Gomez's plea – a course of action that Lind believed would be counterproductive.  (Id.)

The Court addressed Gomez's concerns as follows:

> Let me say that, in my judgment, the plea agreement that was obtained [by Mr. Sporn for] Mr. Gomez was highly favorable to him.  This was a conspiracy count that he pled guilty to.  There was discussion that the hidden compartment in the vehicle that, unbeknownst to Mr. Gomez, had been provided to the DEA, there was discussion between Mr. Gomez and the cooperating witness that the hidden compartment could hold as much as 25 to 30 kilograms of cocaine.
> . . . .
> So, rather than the 5 to 15 [kilograms] being an excessive amount, I think, were Mr. Gomez to have gone to trial, the amount could have actually been much larger and subjected him to a higher sentencing range.
> . . . .
> So I see this as a highly favorable agreement to him.  I understand he's fixated on whether the amount that was seized was actually 5 kilograms or slightly under, but that's irrelevant for purposes of sentencing.
> . . . .
> The amount that was foreseeable to him was far greater than 5 kilograms of cocaine.  The intent was to bring up as much as 25 to 30.  That's why they obtained the car with the trap.
>
> So that's my reaction to what I've heard.

(Id. at 7-8)

The Court went on to rule that it would not appoint a third lawyer to represent

Gomez:

> I'm not going to appoint another lawyer.  I was very clear with Mr. Gomez when I reluctantly excused Mr. Sporn back in March, that that was a one-time event.  Frankly, I saw no basis for relieving Mr. Sporn, who is an extremely experienced criminal defense lawyer.  He's been practicing in this court for decades.
>
> So I did it reluctantly, but it was clear to me that, as sometimes develops, there was a difference of opinion as to how to proceed.  So I was very clear with Mr. Gomez.  I would do this once, and I did it, and a very experienced [lawyer], actually someone similar to Mr. Sporn, was substituted in his place, someone with the same amount of experience, decades of practice in this court, Mr. Lind.
>
> So that's where we are.  So I think the only advice I could offer you, Mr. Lind, is if your client insists on presenting arguments that you deem not supported by the law, I suppose you could make your arguments on behalf of him, and he can submit whatever supplementary argument he wishes to make to me, or he can address me directly, as he deems fit.
>
> I don't see the virtue in substituting a third lawyer, because I don't have any reason to believe the advice is going to be any different.  In fact, I'm quite certain the advice is not going to be any different.  So it would be futile for me to appoint someone else or even to have a third lawyer advise him. . . .

(Id. at 9-10)

### C.   The Sentencing Hearing

On April 14, 2017, the parties appeared for sentencing.  The Court began the

proceedings by questioning Lind and Gomez about whether there were any continuing

difficulties in the attorney-client relationship:

> THE COURT: . . . We were last together on April 10.  At that time, I questioned Mr. Lind about a communication I had received in which he told me that his client was unhappy with his representation.
>
> Mr. Lind, have there been any further developments on that issue?
>
> MR. LIND:  Nothing really.  I think we now have a more positive relationship, Judge.  I think he understands what your Honor ruled and the entirety of what I tried to express to the Court.

7

THE COURT:  All right.  Mr. Gomez, do you have any complaints about Mr. Lind's representation?  Are you comfortable going forward with him at this point?

THE DEFENDANT:  Yes.

(No. 15 Cr. 348, Sentencing Tr. (Dkt. No. 167) at 2)

The Court then addressed the PSR, ordering corrections as to certain typographical errors relating to the dates of particular events.  The PSR's factual statement was otherwise adopted without objection.  (Id. at 5)

The Court then turned to the Guidelines calculations set forth in the PSR, noting that Gomez's total offense level was 29, "which yields a guidelines range of 140 to 175 months' imprisonment."  (Id. at 5-6)  Defense counsel did not object to the Guidelines calculation, but argued in accordance with Defendant's sentencing brief for a downward variance to the minimum mandatory sentence of 120 months' imprisonment, based on new revisions to the commentary to U.S.S.G. § 3B1.2.  (Id. at 6; see also No. 15 Cr. 348, Def. Sentencing Br. (Dkt. No. 152) at 3; U.S.S.G. § 3B1.2)  Lind argued that the revisions suggested that the lack of proprietary interest in a particular transaction should be considered by courts in deciding whether to grant a downward variance.  (No. 15 Cr. 348, Sentencing Tr. (Dkt. No. 167) at 6)

This Court then discussed the nature and circumstances of Gomez's offense, as well as his personal history and characteristics.  (Id. at 9)  The Court began by noting that "this was an unusual case in that a DEA informant was approached about providing a vehicle that contained a secret compartment, commonly known as a trap, and that was the vehicle that was used to drive down to New Orleans to recover the cocaine."  (Id.)  The Court noted that the quantity of cocaine the conspirators discussed transporting to the New York area – which far exceeded the five kilograms of cocaine that Gomez was being held responsible for – was relevant to determining where in the applicable Guidelines range Gomez's sentence should fall.

(Id. at 9-10)  Gomez had sought a "vehicle with a trap" from someone who turned out to be a

DEA informant.  Gomez hoped to "obtain as much as 50 to 100 kilograms of cocaine to bring

back to the New York-New Jersey area [from New Orleans]."  (Id. at 10).  The Court reiterated

that "the plea agreement in which the government stipulated to an amount of 5 to 15 kilograms

was extremely favorable to [Gomez]."  (Id. at 12)  "The evidence that was admitted at the trial of

his brother, Sandy Gomez, demonstrates that Jorge Gomez actually agreed to participate in a

conspiracy that involved a much larger amount of cocaine. . . . [I]t's clear that Mr. Jorge Gomez

was looking for a truck with a compartment that could hold as much as 25 to 30 kilograms of

cocaine."  (Id. at 11-12)

The Court also highlighted Gomez's serious criminal record, which includes two

theft-related convictions, sexual assault in the second degree, a prior drug trafficking conviction,

and repeated parole violations.  (Id. at 13-14)  The Court concluded that Gomez was a "danger to

the community given his criminal record and behavior while under court supervision.  I believe

that there is a high risk of recidivism here."  (Id. at 14)

The Court then imposed a within Guidelines sentence of 155 months'

imprisonment and five years of supervised release.  (Id. at 15)

## III.   GOMEZ'S DIRECT APPEAL

Lind filed a notice of appeal on Gomez's behalf.  (No. 15 Cr. 348, Notice of

Appeal (Dkt. No. 161))  He later submitted a motion pursuant to Anders v. California, 386 U.S.

738 (1967), however, and the Second Circuit granted the Government's motion for summary

affirmance.  See United States v. Gomez, 751 F. App'x 63, 64 n.1 (2d Cir. 2018).

## IV.    **GOMEZ'S HABEAS PETITION**

Gomez filed a habeas petition on August 17, 2017, claiming that his lawyer at the plea bargaining stage – Michael Sporn – was constitutionally ineffective.  (No. 17 Civ. 6190, Mot. (Dkt. No. 1) at 5)  Gomez complained that Sporn advised him to plead guilty to conspiracy to distribute and possess with intent to distribute five kilograms of cocaine – an offense with a 10 year mandatory minimum – even though a lab report for the seized cocaine revealed that only 4.98 kilograms had been seized by the police.  (No. 17 Civ. 6190, Pet. Br. (Dkt. No. 2) at 7-10)  Gomez also claimed that Sporn did not inform Gomez about the laboratory report and other evidence until after he pleaded guilty.  (Id. at 7)  Gomez also complains that Sporn had advised him to "plead guilty . . . or else . . . end up with life."  (Id., Ex. A at 1)

Gomez further argued that Richard Lind was constitutionally ineffective at sentencing, because he did not (1) file a notice of appeal (No. 17 Civ. 6190, Mot. (Dkt. No. 1) at 6-7); and (2) "make any objections . . . in regards to the court['s] judicial fact finding . . . as to [the] weight of [cocaine involved], and a gun enhancement," when the "preponderance of the evidence" did not support either finding.  (No. 17 Civ. 6190, Pet. Br. (Dkt No. 2) at 12)  According to Gomez, Lind promised that he would raise both issues at sentencing, but did not do so.  (Id.)

In response to Gomez's petition, this Court directed Sporn and Lind to submit affidavits addressing Gomez's allegations.  (No. 15 Cr. 348, Order (Dkt. No. 183))

In a May 11, 2018 declaration (see No. 15 Cr. 348, Dkt. No. 195, Ex. 1 (Sporn Decl.)), Sporn states that he never told Gomez that he would receive a life sentence if he did not plead guilty.  Instead, Sporn advised Gomez that "in [Sporn's] judgment the likely sentence if convicted after a trial would be substantially greater. . . ."  (Id. at ¶ 2)  Sporn also states that he

"went through [the evidence] repeatedly and in detail" with Gomez prior to his guilty plea, and

that they explicitly discussed the fact that the laboratory report showed that slightly less than five

kilograms of cocaine had been seized.  (Id. at ¶¶ 3-4)  Indeed, Sporn told Gomez that he would

use this fact to buttress his plea negotiations with the Government.  (Id. at ¶ 4)  Sporn goes on to

say that that strategy proved unsuccessful, because the Government "predictably respond[ed] that

the charged conspiracy was based on other evidence also."  (Id. at ¶ 5)  Sporn states that he

reported the Government's response to Gomez, as well as the Government's threat to pursue

additional charges against Gomez if he rejected the Government's plea offer.  (Id. at ¶¶ 6-7)

According to Sporn, any assertion that Gomez "did not discover that slightly less than 5

kilograms were seized . . . until after he entered his plea is not accurate."  (Id.)

In Lind's May 11, 2018 affirmation (see No. 15 Cr. 348, Dkt. No. 195, Ex. 6

(Lind Affirmation)), he states that Gomez's assertion that he failed to file a notice of appeal is

"utterly false."  (Id. at ¶ 3)  Lind notes that he filed a notice of appeal on April 28, 2017 – three

days after judgment was entered – and that he filed an Anders brief on December 29, 2017.  (Id.)

Lind also denies Gomez's charge that Lind breached his promise to object at

sentencing to the PSR's drug weight and weapon enhancement findings.  According to Lind, he

and Gomez never discussed objecting to the weapon enhancement.  In this regard, Lind notes

that the parties stipulated to the two-level weapon enhancement in the plea agreement.  (Id. at

¶ 5)

As to drug weight, Lind says that he never promised to raise this issue at

sentencing.  Lind states that Gomez told him – prior to sentencing – that he wanted to challenge

the PSR's finding concerning five kilograms of cocaine, and that Lind advised Gomez that –

given the stipulation to five kilograms in the plea agreement and Gomez's statements during the

11

Rule 11 allocution admitting to five kilograms – doing so could put in jeopardy Gomez's three-level reduction for acceptance of responsibility.  (Id. at ¶ 6 and n.1)  Gomez nonetheless "asserted that he wanted to pursue that claim."  (Id. at ¶ 7)  Gomez's insistence on this point led Lind to send his April 4, 2017 letter to the Court reporting that Gomez "'wanted to pursue a course of action which I had previously told him I believed was counterproductive.'"  (Id.)

After the April 10, 2017 court conference – at which the Court had noted that there was evidence that Gomez had told the cooperating witness that he wanted a vehicle that could hold much more than five kilograms of cocaine – "Gomez told [Lind] that he did not wish to pursue the weight issue."  (Id. at ¶ 8)

## V.     GOMEZ'S JULY 5, 2018 LETTER

In a July 5, 2018 letter, Gomez requested that an additional ground for relief be added to his habeas petition:  that his counsel was "ineffective for not [pursuing] a motion to dismiss the indictment due[] to lack of evidence and the facts[,] which [are] clear [that Petitioner] never conspire[d] with any of them but only [] did not want [to] testify and be label[led] as [a] snitch."  (No. 17 Civ. 6190, July 5, 2018 Ltr. (Dkt. No. 21) at 9)  Gomez argues that his guilty plea allocution consists of "facts [that] are not on all fours with Count One.."  (Id. at 7-8)  Gomez further argues that at sentencing, the facts described did not include evidence of him conspiring with co-Defendants Sandy Gomez or Carolina-Ramon Baez.  (Id. at 8)

## VI.    DECEMBER 20, 2019 ORDER DENYING GOMEZ'S PETITION

In a December 20, 2019 order, this Court denied Gomez's petition.  (No. 17 Civ. 6190, Dec. 20, 2019 Order (Dkt. No. 36) at 19)  This Court found that neither Sporn nor Lind was constitutionally ineffective in representing Gomez.  (Id. at 17-18)  As to Sporn, this Court noted that "the plea agreement negotiated by Sporn was 'highly favorable' to Gomez, given the

evidence that he had conspired to transport much larger quantities of cocaine," and that "even in the exercise of hindsight – there is no basis to question Sporn's strategy." (Id. at 15-16 (quoting No. 15 Cr. 348, Apr. 10, 2017 Conf. Tr. (Dkt. No. 165) at 7-8; Sentencing Tr. (Dkt. No. 167) at 12))  As to Lind, this Court noted that "Gomez stipulated to the weapon enhancement and drug weight calculation in his plea agreement," and that accordingly "Lind's failure to object to the weapon enhancement and drug weight calculation was a reasonable strategic decision." (Id. at 18)

## VII.  GOMEZ'S MOTION FOR RECONSIDERATION

Gomez has moved for reconsideration (see No. 17 Civ. 6190, Dkt. No. 40), arguing that (1) this Court overlooked his June 28, 2018 reply brief and a July 5, 2018 letter styled as a motion to amend; and (2) should have conducted an evidentiary hearing. (Id. at 8-9) Gomez also asks this Court to issue a certificate of appealability. (Id. at 9-10)

## DISCUSSION

## I.  LEGAL STANDARDS

### A.  Standard for a Motion for Reconsideration

"Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court." Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012).  "Reconsideration of a previous order by the court is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" RST (2005) Inc. v. Research in Motion Ltd., 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citations and quotation marks omitted)).  "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor

may it be used as a vehicle for relitigating issues already decided by the Court." Davidson v.

Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001).

"The major grounds justifying reconsideration are 'an intervening change in

controlling law, the availability of new evidence, or the need to correct a clear error or prevent

manifest injustice.'" Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d

Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478).

"To these ends, a request for reconsideration under Rule 6.3 must demonstrate controlling law or

factual matters put before the court in its decision on the underlying matter that the movant

believes the court overlooked and that might reasonably be expected to alter the conclusion

reached by the court." RST (2005) Inc., 597 F. Supp. 2d at 365 (citing Shrader v. CSX Transp.,

Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

"[Local] Rule 6.3 is intended to '"ensure the finality of decisions and to prevent

the practice of a losing party . . . plugging the gaps of a lost motion with additional matters."'"

Id. (second alteration in original) (quoting S.E.C. v. Ashbury Capital Partners, L.P., No. 00 Civ.

7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001) (quoting Carolco Pictures, Inc. v. Sirota,

700 F. Supp. 169, 170 (S.D.N.Y. 1988))). "A court must narrowly construe and strictly apply

Rule 6.3 so as to avoid duplicative rulings on previously considered issues and to prevent Rule

6.3 from being used to advance different theories not previously argued, or as a substitute for

appealing a final judgment." Id.

**B.** **Standard for Relief Under 28 U.S.C. § 2255**

28 U.S.C. § 2255 provides, in relevant part, that "[a] prisoner in custody under

sentence of a [Federal] court . . . claiming the right to be released upon the ground that the

sentence was imposed in violation of the Constitution or laws of the United States . . . or that the

sentence . . . is otherwise subject to collateral attack, may move the court which imposed the

14

sentence to vacate, set aside[,] or correct the sentence."  28 U.S.C. § 2255(a).  "Relief under

section 2255 is available only 'for constitutional error, lack of jurisdiction, or an error of law or

fact that constitutes a fundamental defect which inherently results in a complete miscarriage of

justice.'"  Rosa v. United States, 170 F. Supp. 2d 388, 396 (S.D.N.Y. 2001) (quoting Graziano v.

United States, 83 F.3d 587, 589-90 (2d Cir. 1996).

   When ruling on a Section 2255 motion, the district court need not hold an

evidentiary hearing if "the motion and the files and records of the case conclusively show that

the prisoner is entitled to no relief. . . ."  28 U.S.C. § 2255(b).  "To warrant a hearing, the movant

'must set forth specific facts supported by competent evidence, raising detailed and controverted

issues of fact that, if proved at a hearing, would entitle [the movant] to relief.'"  Mann v. United

States, No. 15 Cr. 667-4, 2016 WL 5900174, at *7 (S.D.N.Y. Oct. 11, 2016) (quoting Gonzalez

v. United States, 722 F.3d 118, 131 (2d Cir. 2013)).  "A court need not . . . credit factual

assertions contradicted by evidence in the record of the underlying proceeding," and "'when the

judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown

evidentiary hearing may not be necessary.'"  Id. (quoting Raysor v. United States, 647 F.3d 491,

494 (2d Cir. 2011)).

  **C.**  **Ineffective Assistance of Counsel**

   Courts analyze ineffective assistance of counsel claims under the framework set

out in Strickland v. United States, 466 U.S. 668 (1984).  "In order to prevail on a claim of

ineffective assistance of counsel . . . , a habeas petitioner must satisfy a two-part test."  Mayo v.

Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  The petitioner "'must demonstrate both "that

counsel's performance was deficient" and "that the deficient performance prejudiced the

defense.""  Garner v. Lee, 908 F.3d 845, 861 (2d Cir. 2018) (quoting Waiters v. Lee, 857 F.3d

466, 477 (2d Cir. 2017) (quoting Strickland, 466 U.S. at 687))).

"The performance component of the <u>Strickland</u> test asks whether a 'counsel's representation fell below an objective standard of reasonableness.'"  <u>Kovacs v. United States</u>, 744 F.3d 44, 50 (2d Cir. 2014) (quoting <u>Strickland</u>, 466 U.S. at 688).  "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'"  <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 690).  "When assessing counsel's performance, a court 'must judge his conduct on the basis of the facts of the particular case, "viewed as of the time of the counsel's conduct," and may not use hindsight to second-guess his strategy choices.'"  <u>Muniz v. United States</u>, 360 F. Supp. 2d 574, 578 (S.D.N.Y. 2005) (quoting <u>Mayo</u>, 13 F.3d at 533 (quoting <u>Strickland</u>, 466 U.S. at 690)); <u>see</u> <u>also</u> <u>Parisi v. United States</u>, 529 F.3d 134, 141 (2d Cir. 2008) (warning of the risk that "in the illuminating light of hindsight, [courts] might look back and project <u>ex post</u> knowledge of consequences on the attorney's <u>ex ante</u> selection of one path among the many available to him").  Accordingly, courts "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  <u>Parisi</u>, 529 F.3d at 141 (quoting <u>Strickland</u>, 466 U.S. at 689).

To establish prejudice under the second <u>Strickland</u> prong, a defendant "must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  <u>Garner</u>, 908 F.3d at 861-62 (quoting <u>Strickland</u>, 466 U.S. at 694)).

II.   **ANALYSIS**

Gomez argues that, in ruling on his petition, this Court overlooked his June 28, 2018 reply brief (No. 17 Civ. 6190, Dkt. No. 20) and his July 5, 2018 letter, which is styled as a motion to amend (No. 17 Civ. 6190, Dkt. No. 21).  Gomez is incorrect.

A.   **June 28, 2018 Reply Brief**

In his June 28, 2018 reply brief, Gomez repeats his argument that he could only be held responsible for "less than five kilograms" of cocaine, because the amount seized in a traffic stop was slightly less than five kilograms.  (No. 17 Civ. 6190, Pet. Reply Br. (Dkt. No. 20) at 2)  Gomez also argues that the Court should conduct an evidentiary hearing on the issue of how much cocaine the conspiracy involved.  (Id. at 2-3)

In its December 20, 2019 order, this Court explained that the amount seized – 4.98 kilograms – was not dispositive of the quantity involved in the charged conspiracy:

> As an initial matter, and as both Sporn and Lind explained to Gomez, the Indictment charged Gomez with conspiracy, and thus the amount of drugs actually seized was not dispositive.  The fact that the lab report showed 4.98 kilograms rather than five kilograms of cocaine was not material, because there was ample evidence – included tape-recorded evidence – that Gomez had discussed transporting from New Orleans to the New York area much larger quantities of cocaine – 25 to 30 kilograms.  (No. 15 Cr. 348, Dkt. No. 195, Ex. 1 (Sporn Decl.) at ¶ 5)  Indeed, as this Court observed prior to and at sentencing, the plea agreement negotiated by Sporn was "highly favorable" to Gomez, given the evidence that he had conspired to transport much larger quantities of cocaine.  (No. 15 Cr. 348, Apr. 10, 2017 Conf. Tr. (Dkt. No. 165) at 7-8; Sentencing Tr. (Dkt. No. 167) at 12)

(No. 17 Civ. 6190, Dec. 20, 2019 Order (Dkt. No. 40) at 15)  Accordingly, this Court concluded that any of Gomez's arguments that were premised on the amount of cocaine seized at the traffic stop had no merit, as Sporn's "conduct falls well within 'the wide range of reasonable professional assistance.'"  (Id. at 16 (quoting Parisi, 529 F.3d at 141))  For similar reasons, this

Court found that "Gomez has not shown that the result would have been different absent the alleged ineffective assistance."  (Id.)

Gomez's reply brief raised no additional factual or legal arguments.  Moreover, no evidentiary hearing was necessary to address the quantity of cocaine involved in the conspiracy, because ample evidence – including tape-recordings – demonstrated that the quantity was far in excess of five kilograms.

**B.      July 5, 2018 Letter**

In his July 5, 2018 letter – which Gomez requests that this Court construe as a motion to amend under Fed. R. Civ. P. 15(a) – Gomez makes three additional arguments.  First, Gomez argues that his counsel was "ineffective for not [pursuing] a motion to dismiss the indictment due[] to lack of evidence and the facts[,] which [are] clear [that Petitioner] never conspire[d] with any of them but only [] did not want [to] testify and be label[led] as [a] snitch." (No. 17 Civ. 6190, July 5, 2018 Ltr. (Dkt. No. 21) at 9)  Second, Gomez argues that his guilty plea allocution reflects "facts [that] are not on all fours with Count One.."  (Id. at 7-8)  Finally, Gomez argues that at sentencing, the facts described did not include evidence of him conspiring with co-Defendants Sandy Gomez or Carolina-Ramon Baez.  (Id. at 8)

All of these arguments were refuted in the Court's December 20, 2019 order.  The Court's order makes clear that there was overwhelming evidence against Gomez, and that counsels' decision not to challenge the factual basis for the charge against Gomez was entirely reasonable.  Indeed, as this Court recounts in the December 20, 2019 order, the plea agreement negotiated by counsel was highly favorable to Gomez, because it limited his liability to five kilograms of cocaine, despite compelling evidence that he had conspired to transport much larger quantities from New Orleans to the New York area.  (No. 17 Civ. 6190, Dec. 20, 2019 Order (Dkt. No. 36) at 15 (citing No. 15 Cr. 348, Apr. 10, 2017 Conf. Tr. (Dkt. No. 165) at 7-8;

Sentencing Tr. (Dkt. No. 167) at 12)))  This Court thus concluded that "even in the exercise of hindsight[,] there is no basis to question Sporn's strategy.  (Id. at 16)  Gomez's additional assertions in his July 5, 2018 letter do not in any way alter this conclusion, because they all would require impermissibly second-guessing a strategy that – even with the benefit of hindsight – resulted in a plea agreement that was highly beneficial to Gomez.

As to the sufficiency of the Indictment, the Government charged that Gomez and his co-Defendants "intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.  It was a part and object of the conspiracy that . . . the defendants . . . would and did distribute with intent to distribute a controlled substance . . . five kilograms and more of mixtures and substances containing a detectable amount of cocaine. . . ."  (No. 15 Cr. 348, Indictment (Dkt. No. 1) Count One)  These allegations plainly suffice under 21 U.S.C. §§ 846 and 841(b)(1)(A) to survive a motion to dismiss.  See United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) ("Typically, to state an offense, an indictment need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms." (internal quotation marks and citation omitted)).

As to Gomez's plea allocution, it plainly satisfies all elements of the charged narcotics conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A).  Gomez stated that he "agreed with others to get a vehicle SUV that had a hidden compartment for the purpose of having another person transport cocaine in [the] hidden compartment from the south to the New York/New Jersey area where it [would] have been distributed."  (No. 15 Cr. 348, Plea Tr. (Dkt. No. 106) at 11)  Gomez further stated that he understood that five kilograms of cocaine would be transported in the hidden compartment.  (Id.)  This allocution is plainly sufficient.

Finally, the facts discussed in the PSR and at sentencing were fully consistent with the charge against Gomez.  At sentencing, the Court recounted that "this was an unusual case in that a DEA informant was approached [by Gomez] about providing a vehicle that contained a secret compartment, commonly known as a trap, and that was the vehicle that was used to drive down to New Orleans to recover the cocaine."  (No. 15 Cr. 348, Sentencing Tr. (Dkt. No. 167) at 9)  Gomez employed his brother – Sandy Gomez – and Jorge Gomez's girlfriend – Carolina Ramon-Baez – to travel to New Orleans to retrieve the cocaine.  They were stopped while driving back to the New York area, and a search of the vehicle led to the recovery of 4.98 kilograms of cocaine.  (No. 17 Civ. 6190, Dec. 20, 2019 Order (Dkt. No. 36) at 15; No. 15 Cr. 348, PSR (Dkt. No. 136) at 7-9)

At sentencing, the Court noted that the quantity of cocaine the conspirators had discussed transporting – which far exceeded the five kilograms of cocaine that Gomez was being held responsible for – was relevant to a determination of where in the applicable range Gomez's sentence should fall.  (No. 15 Cr. 348, Sentencing Tr. (Dkt. No. 167) at 9-10)  The Court noted that Gomez sought a "vehicle with a trap" from someone who turned out to be a DEA informant in the hope of "obtain[ing] as much as 50 to 100 kilograms of cocaine to bring back to the New York-New Jersey area [from New Orleans]."  (Id. at 10)  In sum, this Court's description of the facts at sentencing was fully consistent with the evidence.

Gomez's motion for reconsideration will be denied.

### C.      Certificate of Appealability

A certificate of appealability may not issue unless "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  Where, as here, "a district court has rejected the constitutional claims on the merits, the showing required to

satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Gomez has made no such showing.  For the reasons explained above and in the December 20, 2019 order, defense counsel Sporn and Lind discharged their duties reasonably, even in hindsight, and none of Gomez's contentions about the sufficiency of evidence have any merit.  Accordingly, Gomez's motion for a certificate of appealability will be denied.

## <u>CONCLUSION</u>

For the reasons stated above, Petitioner's motion for reconsideration of this Court's December 20, 2019 Order is denied.  Petitioner's motion for a certificate of appealability is likewise denied.  The Clerk of Court is directed to terminate the motions.  (No. 17 Civ. 6190, Dkt. Nos. 40, 43; No. 15 Cr. 348, Dkt. Nos. 223, 226)

Copies mailed by Chambers.

Dated:  New York, New York
      August 8, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge